**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| INNOVAIR CORPORATION, | |
|   Plaintiff & Counter-Defendant, | Civil No. 23-1079(GMM-GLS) |
| v. | |
| FACTORY DIRECT SALES AND CONSULTANT, INC., | |
|   Defendant, Counterclaimant & Third-Party Plaintiff, | |
| v. | |
| INNOVAIR SOLUTIONS, | |
|   Third-Party Defendant. | |

**OPINION AND ORDER**

Before the Court is the *Report and Recommendation* issued by Magistrate Judge Giselle López-Soler ("Magistrate Judge López-Soler") (Docket No. 117), recommending denial of Defendant Factory Direct Sales and Consultant, Inc.'s ("FDSC") request for a preliminary injunction pursuant to the Puerto Rico Dealer's Act, P.R. Laws Ann. tit. 10 §§ 278 et seq. ("Law 75"). *See* Docket Nos. 8, 65. Having reviewed the full briefing and the evidentiary record de novo, the Court addresses Defendant's objections, ADOPTS the *Report and Recommendation* WITH MODIFICATIONS, and DENIES FDSC's request for a preliminary injunction.

Civil No. 23-1079 (GMM-GLS)
Page - 2 -

## I.    FACTUAL AND PROCEDURAL BACKGROUND

For concision, the Court incorporates by reference the factual and procedural background set forth in the Court's previous Opinion and Order (Docket No. 116), in which the Court granted Plaintiff Innovair Corporation's and Third-Party Defendant Innovair Solutions' (collectively, "Innovair") Partial Motion to Dismiss Pursuant to Fed. R. Civ. 12(b)(6), (Docket No. 72).

After holding a four-day evidentiary hearing - and upon examining the documentary evidence and the parties' briefs - Magistrate López-Soler produced a *Report and Recommendation* denying FDSC's request for a preliminary injunction pursuant to Law 75. (Docket No. 117).

FDSC timely filed an Objection to *Report and Recommendation* (ECF No. 117) (FDSC's "Objection") on August 13, 2024. (Docket No. 118). In its Objection, FDSC disputes four factual findings, (Id. at 5-10), and challenges the legal analysis espoused for the denial the preliminary injunction, (Id. at 10-25).

Innovair filed a Response in Opposition to FDSC's "Objection to *Report and Recommendation* (ECF No. 117)" (Innovair's "Response") on September 6, 2024. (Docket No. 126). FDSC replied on September 23, 2024, with a Reply to Innovair's Response in Opposition to FDSC's Objection to *Report and Recommendation* (ECF

Civil No. 23-1079 (GMM-GLS)
Page - 3 -

No. 126). (Docket No. 131). Innovair then responded on October 15, 2024 with a Surreply to FDSC's Objections to R&R. (Docket No. 134).

With the benefit of a complete evidentiary record and fully briefed objections, responses, and replies, the Court proceeds to evaluate the matter de novo.

## II.  LEGAL STANDARD

District courts may refer a pending motion to a magistrate judge for a report and recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). In turn, adversely impacted parties may "serve and file specific written objections to the proposed findings and recommendations" within fourteen days of receipt of a magistrate judge's report and recommendation." 28 U.S.C. § 636(b)(1)(C).

Upon receipt of timely objections, the Court conducts de novo review of those portions of the *Report and Recommendation* to which specific objections have been made. Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 123 (1st Cir. 2011); see also United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986). In its review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

Civil No. 23-1079 (GMM-GLS)
Page - 4 -

As for findings of fact and determinations of law included within the magistrate's report and recommendation and for which no objections were raised, a district court may accept these portions of a magistrate judge's report and recommendation, so long as the Court is satisfied that they do not contain a plain error. See Rey-Cruz v. Forensic Sci. Inst., 794 F. Supp. 2d 329, 332 (D.P.R. 2011) ("The Court, in order to accept unopposed portions of the Magistrate Judge's Report and Recommendation, needs only satisfy itself that there is no 'plain error' on the face of the record."); Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985)("Absent objection by the plaintiffs, the district court had a right to assume that plaintiffs agreed to the magistrate's recommendation."). "[A] party's failure to assert a specific objection to a report and recommendation irretrievably waives any right to review by the district court and the court of appeals." Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998); see also Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993) (stating that an "[o]bjection to a magistrate's report preserves only those objections that are specified").

Civil No. 23-1079 (GMM-GLS)
Page - 5 -

### III. APPLICABLE LAW AND ANALYSIS

A.  <u>Findings of Fact</u>

The parties submitted stipulated facts. (Docket No. 79). In addition, Magistrate López-Soler made twenty-eight findings of fact, (Docket No. 117 at 3-6), of which FDSC challenges facts 4, 16, 22, and 26. (Docket No. 118 at 5-10). FDSC "respectfully requests the District Judge to accept" findings of fact 1-3, 5-15, 17-21, 23-25, and 27-28 "without modification." (<u>Id.</u> at 5).

Upon this Court's review - and taking into account the parties' lack of objections as to these factual findings - the Court finds that Magistrate Judge López-Soler's *Report and Recommendation* does not contain plain error as to findings of fact 1-3, 5-15, 17-21, 23-25, and 27-28. The Court hereby ADOPTS these factual findings without modification and now moves to examine the objected factual findings.

FDSC argues that the four objected findings of fact - numbers 4, 16, 22, and 26 - are erroneous because "although the evidence in record does support many of the R&R's findings, it does not support the interpretation given to the direct sales method that was agreed between the parties, nor to FDSC's role and rights in those types of sales." (<u>Id.</u> at 4). "Most importantly," FDSC contends, "the R&R left out the fact that FDSC's relationship with Roger Electric and with 90% of its remaining clients was not

Civil No. 23-1079 (GMM-GLS)
Page – 6 –

limited to, nor part of, the direct sales approach." (Id.). In its Objection, FDSC further indicates that Magistrate López-Soler's recommendation to deny injunctive relief is a "direct consequence" of [these] unsupported findings of facts and, specifically, the result of a "mistaken interpretation of the evidence admitted and even [of] conclusions not supported by documentary evidence." (Id. at 4).

The Court reviews in turn the four contested factual findings.

1.  Factual Finding No. 4: "'In 2012, Innovair closed the two stores it had in Puerto Rico.' Testimony of Padilla and Gómez. Day 1 Tr. at pp. 30 lines 21-23; 31 lines 1-2; Day 3 Tr. at pp. 469 lines 3-9; 470 lines 1-6." (Docket No. 117 at 3).

Factual finding No. 4 is supported by the evidence, for three reasons. First, FDSC admits that "[c]ertainly, testimony evidence points to this conclusion" that Innovair closed its two Puerto Rico stores in 2012. (Docket No. 118 at 6). That concession alone undermines FDSC's own objection.

Second, FDSC does not challenge the admissibility of the testimonial evidence that support Factual Finding No. 4, nor does it challenge the Magistrate López-Soler's credibility assessment. To the contrary, FDSC merely posits that the omission of certain alleged documentary evidence would have negated Factual Finding No. 4 – namely that Innovair's 2011 balance sheet reflects no sales

Civil No. 23-1079 (GMM-GLS)
Page - 7 -

that year, which FDSC argues is evidence that Innovair ceased
operations prior to 2012. (Docket No. 113-45).

The 2011 balance sheet cited by FDSC does not contradict the
finding that Innovair closed its Puerto Rico stores in 2012. The
fact that no sales were reported in Innovair's 2011 balance sheet
does not necessarily mean that Innovair closed its storefronts
that same year: businesses can remain open while not reporting
sales due to inventory depletion, restructuring, pending
dissolution, or other circumstances. At most, the absence of
reported sales in 2011 suggests a decline in business activity,
not the actual closure of retail operations. FDSC's inference that
Innovair ceased all operations prior to 2012 is speculative, as
financial statements alone cannot establish the precise date a
company closed its stores. Although the documentary evidence cited
by FDSC raises a plausible inference, it does not establish a
genuine, material contradiction. Cf. Metzler Asset Mgmt. GmbH v.
Kingsley, 928 F.3d 151, 164 (1st Cir. 2019) ("[T]the fact that the
company reduced sales targets does not, necessarily, mean that
actual sales fell at a commensurate rate.") (emphasis included in
original).

Third, and most pressing, FDSC conceded in its Answer to the
Amended Complaint and Amended Counterclaim with Preliminary
Injunction Petition that the closures of Innovair's storefronts

Civil No. 23-1079 (GMM-GLS)
Page - 8 -

occurred "on or around January 2012." (Docket No. 65 at 11 ¶ 10) ("On or around January 2012, Innovair ended its operations in Puerto Rico by closing its two retail over-the-counter stores."). FDSC's answer provides a far more reliable and direct basis for to find that Innovair, indeed, closed its two stores in 2012.

Having affirmatively pled the 2012 date, FDSC cannot now contradict it simply because it perceives strategic advantage. Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.") (citing Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 528 (2d Cir. 1985)).

Upon de novo review of the evidentiary record as a whole, the Court finds that, in 2012, Innovair closed the two stores it had in Puerto Rico. FDSC's objection as to Factual Finding No. 4 is hereby **OVERRULED**.

> 2. Factual Finding No. 16: "After the meetings in Florida, Clean Air stopped purchasing Innovair products through FDSC and began to buy directly from Innovair. Testimony of Caballero. Day 3 Tr. at p. 380 lines 6-17." (Docket No. 117 at 4).

Breaking it into parts, Factual Finding No. 16 asserts that: (a) Clean Air previously purchased Innovair products through FDSC; and (b) after the Florida meetings, Clean Air changed its purchasing channel to buy products directly from Innovair, rather

Civil No. 23-1079 (GMM-GLS)
Page - 9 -

than using FDSC as an intermediary. (Id.). FDSC objects, arguing that Clean Air never actually purchased Innovair products through FDSC, it only intended to do so — its purchase orders were never fulfilled by either FDSC or Innovair. FDSC further posits that, following Innovair's alleged interference, Clean Air's orders were handled directly by Innovair. In short, FDSC says that Factual Finding No. 16 is incorrect because it assumes a prior pattern of purchases "through FDSC" that never existed in practice. (Docket No. 118 at 6).

On the opposing side, Innovair responds that the record still supports the challenged finding because FDSC admits the essential underlying fact: Clean Air ultimately purchased directly from Innovair, not through FDSC. (Docket No. 116 at 6). Innovair expresses that the dispute about whether Clean Air previously purchased through FDSC is immaterial, because the key takeaway still stands: multiple distributors existed and, hence, FDSC's claim of exclusivity fails. (Id. at 6).

The transcript for the third day of the evidentiary hearing, held by Magistrate López-Soler on June 22, 2024, shows that Clean Air was initially instructed to send purchase orders to Mr. Pedro Joaquín Padilla García ("Mr. Padilla"), the President of FDSC. (Docket No. 99 at 380-81). Then, during a meeting with Mr. Ernesto García ("Mr. García"), Innovair's Territory Manager, Clean Air was

Civil No. 23-1079 (GMM-GLS)
Page - 10 -

told to send its orders directly Innovair, rather than placing the orders through FDSC. (Id.). Clean Air followed this instruction and began to send its orders directly to Innovair, in contradiction with Clean Air's prior arrangements with FDSC. (Id.).

The transcript reflects that Clean Air initially placed orders through FDSC and, following meetings with Innovair representatives in Florida, began placing orders directly from Innovair. (Id.).

Upon de novo review, the Court finds that, after the meetings in Florida, Clean Air stopped purchasing Innovair products through FDSC and began to buy directly from Innovair. FDSC's objection as to Factual Finding No. 16 is hereby OVERRULED.

3.  Factual Finding No. 22: "Roger Electric used its credit line with Euler Hermes to purchase the products from Innovair. The transactions were made through FDSC. FDSC would establish the sales price of the products to be bought by Roger Electric, FDSC would complete the purchase order for Roger Electric, and FDSC would receive compensation from the sales made to Roger Electric. The products were shipped directly from Innovair to Roger Electric. Day 2 Tr. at pp. 249 lines 20-25; 250 lines 1-19; 320 lines 24-24; 321 lines 1-3. This is called the "direct sales" model, which was implemented to allow FDSC to complete sales of Innovair products to its clients without having to exhaust its line of credit, using the client's line of credit instead. Joint Exhibits 9, 12-13, 16; Day 1 Tr. at pp. 24 lines 11-25; 25 lines 1-17; 103 lines 12-25; 104 lines 1-23. Day 2 Tr. at pp. 319 lines 14-25; 320 lines 17-24." (Docket No. 117 at 5.)

FDSC's third objection claims that Factual Finding No. 22 "incorrectly implies that FDSC's relationship and sales to Roger

Civil No. 23-1079 (GMM-GLS)
Page - 11 -

Electric were all under the direct sales method, to force the conclusion that FDSC was not acting as Innovair's distributor on those sales." (Docket No. 118 at 8).

FDSC argues that "although the direct sales method was implemented with Roger Electric since at least 2015 . . . , FDSC continued selling Innovair products to Roger Electric simultaneously, without using Euler Hermes credit line, as such sales were directly made from FDSC's inventory and warehouse." (Id. at 7) (emphasis omitted). Hence, FDSC contends that not all sales of Innovair products to Roger Electric were made under the "direct sales" model.

To the contrary, FDSC alleges that it sold Innovair products to Roger Electric: (1) from its own inventory and warehouse using Roger Electric's credit line with FDSC; and (2) under the "direct sales" model using Euler Hermes, at least when FDSC lacked inventory or credit capacity for larger transactions. (Id.). In addition, FDSC further posits that "the [Innovair] products were not always shipped directly from Innovair to Roger Electric," but rather "[o]ftentimes, FDSC would store and hold Roger's products at FDSC's warehouse, for their subsequent transportation to Roger." (Id.).

The transcript demonstrates that – at times - FDSC sold Innovair products from its own warehouse to Roger Electric, and

Civil No. 23-1079 (GMM-GLS)
Page – 12 –

invoiced Roger Electric directly for these products. Consider, for instance, this snippet of FDSC's responses from the transcript:

> Q: Where did the first shipment of Innovair products came [sic] from?
> A: From our warehouse.
>
> [. . .]
>
> Q: Did you sell those products to Roger Electric?
> A: Yes, sir.

(Docket No. 97 at 115-16). This confirms that not all transactions followed the "direct sales" model. However, FDSC continued selling Innovair products directly to Roger Electric by using its own inventory, even after the implementation of the "direct sales" model, which means that the direct sales model coexisted with - and did not entirely replace - traditional distributor sales. (Id. at 116-17, 121).

The testimony clarifies that not all of Roger Electric's purchases of Innovair products followed the "direct sales" model. (Docket No. 98 at 250). As stated, "sometimes we [FDSC] received the [Innovair] products and we [FDSC] store it for them [Roger Electric]," and "some others they [Roger Electric] receive them [the Innovair products] direct[ly]" from FDSC - showing the coexistence of sales from FDSC's own inventory and of sales from the "direct sales" model. (Id.). Shipments under the direct sales model were sometimes direct from Innovair to Roger Electric, but

Civil No. 23-1079 (GMM-GLS)
Page - 13 -

other times routed through FDSC's warehouse[1] — demonstrating variation:

> Q: When you take for instance Roger Electric would purchase air conditioning through you, right?
> A: Yes.
>
> [. . .]
>
> A: Sometimes we received the products and we [FDSC] store[d] it for them.
>
> [. . .]
>
> Q: So there were times where Innovair would send directly to Roger [Electric], both air conditioning and parts.
> A: Yes, correct.
> Q: Okay and is that also true for other clients, for other, for example for Clean Air or for other clients?
> A: Yes, ma'am.

(Id. at 249-50).

Innovair shipments did not always go directly to Roger Electric; FDSC sometimes took physical possession of them and handled the delivery to Roger Electric. Compensation to FDSC for these transactions varied depending on whether the sale was made from its inventory or through the direct sales model. Accordingly, there were two invoicing methods — one for direct sales, and one for FDSC's own inventory sales. (Docket No. 97 at 141-42).

---

[1] FDSC submitted *Defendant's Exhibits 11A-11J, 12A-12B,* and *30* which, on their face, suggest that FDSC and Roger Electric conducted business dealings directly with each other – without intermediaries – as early as February 2015 and as late as November 2020, after the implementation of the "direct sales" model. (Docket Nos. 113-11; 113-12; 113-30).

Civil No. 23-1079 (GMM-GLS)
Page - 14 -

As worded, Factual Finding No. 22 overstates the uniformity of the "direct sales" model. The record shows that, while Roger Electric did purchases under the "direct sales" model, FDSC also sold Innovair products directly to Roger Electric from its own inventory. In some cases, Innovair products that were purchased by Roger Electric were stored and delivered by FDSC. (Id.).

Innovair's Response correctly states that the "direct sales" model was adopted at a later time and was distinct from FDSC's earlier distributorship role. (Docket No. 126 at 7-8). The *Report and Recommendation* indeed recognizes this distinction. However — as the transcript shows — even after the implementation of the "direct sales" model, FDSC continued to implement at least some non-direct sales by handling shipments and logistics itself. Thus, while both Innovair's Response and Factual Finding No. 22 are correct in emphasizing and summarizing the "direct sales" structure, the language of the contested finding does not explicitly limit the extent of "direct sales" model and, thus - as worded - Factual Finding No. 22 risks being read as inaccurately describing all dealings with Roger Electric. It is the judgment of this Court that further clarification is warranted.

Therefore, the Court **MODIFIES** the *Report and Recommendation*'s Factual Finding No. 22 to the following: Roger Electric at times purchased Innovair products pursuant to a "direct sales" model

Civil No. 23-1079 (GMM-GLS)
Page - 15 -

under which Roger Electric utilized its credit line with Euler
Hermes. In those transactions, FDSC acted as an intermediary by
establishing pricing, preparing purchase orders, and receiving
compensation from Innovair. Products were generally shipped
directly from Innovair to Roger Electric. On some occasions,
shipments were routed through FDSC's warehouse for storage and
subsequent delivery. Separately, FDSC also sold Innovair products
to Roger Electric from its own inventory, extending credit directly
and invoicing Roger Electric accordingly. The direct sales model
was implemented primarily to allow FDSC to facilitate larger
transactions without exhausting its own line of credit.

Factual Finding No. 26: "On June 1, 2022, FDSC sent a proposed
distribution agreement to Innovair. Joint Exhibit 8; Docket No. 65
at ¶ 36." (Docket No. 117 at 5.)

FDSC objects to Factual Finding No. 26, indicating that "FDSC
did not send a proposed distribution agreement; it sent a proposal,
as the document itself shows. . . . It was sent at the request of
Innovair's new owners . . . after [they] unilaterally attempted to
change payment terms for FDSC after 10 years of distribution
relationship." (Docket No. 118 at 8) (emphasis omitted). "FDSC
rejected to accept such proposal as it impaired its distribution
rights." (Id.) (emphasis omitted).

Civil No. 23-1079 (GMM-GLS)
Page – 16 –

Although the Court acknowledges FDSC's desire to clarify the circumstances surrounding the transmission of the proposed agreement, Factual Finding No. 26 is supported by the evidentiary record and is complete and accurate.

As a matter of fact, in its own Answer to Complaint, FDSC indicates that "in an attempt to seek an amicable solution and avoid litigation, on June 1st, 2022, FDSC sent Innovair a proposed distribution agreement to put in writing what the parties' relationship had been until then and to continue to abide by the same." (Docket No. 65 ¶ 36). In its own words, FDSC characterizes the document as "a proposed distribution agreement." (Id.). Having affirmatively pled the existence of "a proposed distribution agreement," FDSC may not contradict its own words. Schott Motorcycle Supply, 976 F.2d at 61.

Upon de novo review, the Court finds that, on June 1, 2022, FDSC sent a proposed distribution agreement to Innovair. FDSC's objection as to Factual Finding No. 26 is hereby OVERRULED.

B.    Preliminary Injunction under Law 75

FDSC seeks a preliminary injunction, pursuant to Law 75. Such injunctive relief would entail this Court ordering Innovair: (1) to release and deliver all pending purchase orders placed and paid by FDSC, and to serve all other purchases that could be placed by FDSC; (2) refrain from selling directly in Puerto Rico, including

Civil No. 23-1079 (GMM-GLS)
Page - 17 -

to Roger Electric; (3) refrain from appointing a different distributor in Puerto Rico; and (4) refrain from changing any of the terms and conditions of the exclusive agreement between Innovair and FDSC. (Docket Nos. 65 at 18; 65-1 at 15). In its Objection, FDSC argues that the Court should grant the sought injunctive relief because "by failing to recommend the requested injunctive relief" the Defendant's "sales and client relationships continue to be threatened by Innovair's unilateral attempts to directly approach and sell to those clients without FDSC's intervention." (Docket No. 118 at 4).

"Law 75 governs the business relationship between principals and the locally appointed distributors that market their products." Medina & Medina Inc. v. Hormel Foods Corp., 840 F.3d 26, 41 (1st Cir. 2016) (quoting Irvine v. Murad Skin Rsch. Labs., 194 F.3d 313, 317 (1st Cir. 1999)) (citation modified). Specifically, Law 75 establishes that, once a distributor has created a favorable market for the principal's products or service, the principal is prohibited from either terminating or impairing such relationship, except for "just cause." P.R. Laws Ann. tit. 10 § 278a-b.

The statute was enacted to avoid "the inequity of arbitrary termination of distribution relationships once the designated dealer had successfully developed a local market for the

Civil No. 23-1079 (GMM-GLS)
Page - 18 -

principal's products and/or services." Medina & Medina, 840 F.3d at 41 (quoting Irvine, 194 F.3d at 317); see also Twin Cnty. Grocers, Inc. v. Mendez & Co., Inc., 81 F. Supp. 2d 276, 283 (D.P.R. 1999) ("The [Puerto Rico] legislature had observed that dealers in Puerto Rico were particularly vulnerable to summary termination once they had established a favorable market for a principal's product.") (citing Draft-Line Corp. v. Hon Co., 781 F. Supp. 841, 844 (D.P.R. 1991)). In that vein, Law 75 prohibits principals from engaging in conduct that "directly or indirectly" impairs - or is detrimental to - the established relationship between the principal and the distributor. P.R. Laws Ann. tit. 10 § 278b-1; Irvine, 194 F.3d at 318 (explaining the scope of Section 278b-1).

In any legal action in which a distributor alleges that a principal has terminated or impaired their business relationship, Law 75 authorizes the issuance of a preliminary injunction by which the Court may order the involved parties to continue fulfilling the obligations of their distribution agreement, pending litigation. P.R. Laws Ann. tit. 10 § 278b-1; see Re-Ace, Inc. v. Wheeled Coach Indus., 363 F.3d 51, 54 (1st Cir. 2004). In these cases, the First Circuit looks to the following test:

> The framework for considering whether to grant or deny a preliminary injunction is well settled: An inquiring court [1] must gauge the movant's likelihood of success on the merits; [2] must evaluate whether and to what

Civil No. 23-1079 (GMM-GLS)
Page – 19 –

extent the movant will suffer irreparable harm if
injunctive relief is withheld; [3] must calibrate the
balance of hardships as between the parties; and [4]
must consider the effect, if any, that the issuance of
an injunction (or the withholding of one) will have on
the public interest.

Bayley's Campground, Inc. v. Mills, 985 F.3d 153, 158 (1st

Cir. 2021) (quoting Akebia Therapeutics, Inc. v. Azar, 976 F.3d

86, 92 (1st Cir. 2020) (internal quotations omitted). In evaluating

requests for preliminary injunctive relief under Law 75, courts

consider the traditional four-factor test, while also giving

effect to the statute's policy favoring the continuation of

dealership relationships pending adjudication.

In addition to this test, Law 75 sets a framework of

additional considerations for the Court: In the exercise of

balancing the four relevant factors for the issuance of a

preliminary injunction, Law 75 places a thumb on the scale, as to

give certain factor more weight and tip the balance in favor of

granting the sought injunctive relief.[2] Namely, the preliminary

injunction under this statutory provision "is not tied to a showing

of irreparable injury or to probability of success in the case on

---

[2] When sitting in diversity jurisdiction, federal district courts apply federal
procedural law, and the substantive law of the state or territory where it sits.
Erie R. Co. v. Tompkins, 304 U.S. 64, 69 (1938). Nonetheless, "[t]he question
whether a preliminary injunction should be granted is generally one of federal
law even in diversity actions, though state law issues are sometimes relevant
to the decision to grant or deny." Revolutions Med. Corp. v. Med. Inv. Grp.
LLC, No. 12-CV-10753, 2013 WL 1087693, at *5 (D. Mass. Mar. 13, 2013) (internal
citations omitted).

Civil No. 23-1079 (GMM-GLS)
Page – 20 –

the merits, but rather to the policies of the Act in promoting the continuation of dealership agreements and the strict adherence to the provisions of such agreements." Waterproofing Sys. v. Hydro-Stop, Inc., 440 F.3d 24, 33 (1st Cir. 2006) (quoting De Moss v. Kelly Servs., Inc., 493 F.2d 1012, 1015 (1st Cir. 1974)). This charges the Court with "look[ing] both to the parties' 'interests' and to the Act's 'public policy.' The basic 'public policy' of the Act is to prevent dealer termination without 'just cause.' The strength of the parties' interests also may depend upon the likelihood that 'just cause' will be found." Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F.2d 172, 173 (1st Cir. 1984) (internal citations omitted). Despite these modifications, district courts may still consider the movant's likelihood of success on the merits and whether it would suffer irreparable harm. (Id.).

With this in mind, the Court now examines these relevant factors and addresses FDSC's objections to Magistrate Soler-López's *Report and Recommendation* denying injunctive relief.

1. Likelihood of Success on the Merits

Pursuant to Law 75, a preliminary injunction may be issued when the movant asserts a claim of termination or a claim of impairment. P.R. Laws Ann. tit. 10 § 278b-1. At this juncture, the only claim to consider is that of impairment, given that the Court

Civil No. 23-1079 (GMM-GLS)
Page – 21 –

has already dismissed FDSC's cause of action for termination. See (Docket No. 116 at 2). Hence, the likelihood of success on the merits is judged in accordance with FDSC's claim of impairment.

Pursuant Law 75, there is a "rebuttable presumption of an impairment" when a principal "establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico . . . in conflict with the contract existing between the parties." Medina & Medina Inc., 840 F.3d at 41 (quoting P.R. Laws Ann. tit. 10 § 278b-1).

Whether FDSC is likely to establish a claim of impairment depends on the specific terms of its dealership agreement with Innovair – mainly, on whether the parties' dealership agreement was exclusive or not. See, e.g., Irvine, 194 F.3d at 318 ("The protection afforded to" distributors under Law 75 "is circumscribed by those rights acquired under the agreement regulating their business relationship."); Vulcan Tools of P.R. v. Makita USA, Inc., 23 F.3d 564, 569 (1st Cir. 1994) ("The question whether there has been a 'detriment' to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired."); Nike Int'l, Ltd. v. Athletic Sales, Inc., 689 F. Supp. 1235, 1238 (D.P.R. 1988) (Law 75 should not be interpreted to

create a "safe-haven for dealers to avoid the express terms of the contracts to which they willingly subscribed.").

Therefore, prior to assessing FDSC's likelihood to succeed on its claim of impairment pursuant to Law 75, the Court must address the preliminary matter of whether the dealership agreement in question was exclusive or not.

a.    FDSC and Innovair had a non-exclusive dealership agreement

In 2012, the parties verbally agreed for FDSC to distribute Innovair products in Puerto Rico, (Docket Nos. 97 at 44-47), yet a written distribution agreement was never executed, (Docket No. 79 at 3 ¶ vii). FDSC sustains that the verbal agreement set forth exclusivity, whereas Innovair disagrees. (Docket Nos. 62 at 3 ¶ 12; 65 at 11 ¶ 12). To determine whether the parties' verbal agreement entailed exclusivity or not, Court examines the parties' course of dealings. José Santiago, Inc. v. Smithfield Packaged Meats Corp., 66 F.4th 329, 339 (1st Cir. 2021).

To examine the parties' course of dealings, the Court will evaluate the unobjected facts, which establish the following. FDSC began distributing Innovair products in 2012, undertaking activities that are typically associated with a Law 75 distributor. (Docket Nos. 62 at 3 ¶ 12; 65 at 11 ¶¶ 12-13); P.R. Laws Ann. tit. 10 § 278b (A dealer's contract is defined as a "relationship established between a dealer and a principal or grantor

Civil No. 23-1079 (GMM-GLS)
Page - 23 -

[irrespective of the relationship], the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico."); Re-Ace, Inc., 363 F.3d at 55 (quoting Triangle Trading Co. v. Robroy Indus., 200 F.3d 1, 4-5 (1st Cir. 1999)) ("[T]he [C]ourt [has] derived the following characteristics of a dealership: promotion of the product, keeping an inventory, fixing prices, delivery and billing responsibilities, authority to extend credit, advertising campaigns, assumption of risk, purchasing the product, maintaining facilities, and offering product-related services to clients.").

From 2016 until 2022, at least one other air conditioning company — Clean Air — began to purchase products directly from Innovair and sell those products in Puerto Rico, without the intervention of FDSC. (Docket No. 98 at 278-87). Since 2016, FDSC knew that Clean Air was purchasing products from Innovair and selling those products in Puerto Rico. (Id.). Despite an initial protest, FDSC took no further action to halt Clean Air's sale of Innovair products. (Id.). This matter became more contentious with the implementation of the "direct sales" model, by which Innovair sells its products in the Puerto Rico market – particularly as to Roger Electric in 2022 - without using FDSC as its exclusive dealer. (Docket Nos. 62 at 5; 65 at 18 ¶ 54). Subsequently,

Civil No. 23-1079 (GMM-GLS)
Page – 24 –

Innovair filed an Amended Complaint seeking declaratory judgment
from this Court, establishing that FDSC is not an exclusive
distributor under Law 75. (Docket No. 62 at 2 ¶ 6). FDSC filed a
counterclaim to vindicate its status as an exclusive dealer.
(Docket No. 65 at 17-18 ¶¶ 50-57).

As the First Circuit has made clear, "[e]xclusivity is
generally apparent either from the contract or from the
arrangements agreed upon between the parties." IOM Corp. v. Brown
Forman Corp., 627 F.3d 440, 448 (1st Cir. 2010) (quoting Orba,
Inc. v. MBR Indus., Inc., 49 F. Supp. 2d 67, 71 (D.P.R. 1999))
(internal quotations omitted). Moreover, exclusivity "is met where
neither the principal merchant nor third parties are allowed to
sell the [principal's] product in the same territory or market in
which the sales representative operates." Id. (citing Cruz Marcano
v. Sánchez Tarazona, 172 D.P.R. 526, 537-38 (P.R. 2007).[3]

Upon de novo review of the record, the Court determines that
FDSC did not enjoy an exclusive dealership for three reasons.

---

[3] The Court notes that the cases cited in this paragraph discuss the issue of
exclusivity as it pertains to Puerto Rico's Sales Representative Act, P.R. Laws.
Ann. tit. 10 §§ 279a-279h, also known as "Law 21." Yet, as established by the
First Circuit, Law 21 "is modeled on [Law 75], which provides similar
protections to distributors." Rafael Rodríguez Barril, Inc. v. Conbraco Indus.,
Inc., 619 F.3d 90, 93-94 (1st Cir. 2010). "In enacting Law 21, the Puerto Rico
[L]egislature explained that the statute purported 'to protect sales
representatives and other local agents who fell short of the requirements for
'dealership' status under Law 75.'" IOM Corp., 627 F.3d at 445 n.3 (citing Re-
Ace, Inc., 363 F.3d at 57).

Civil No. 23-1079 (GMM-GLS)
Page - 25 -

First, the fact that FDSC was, between 2012 to 2016, the sole seller of Innovair products is not enough to establish exclusivity. See Valentín v. White Rose, Inc., 993 F. Supp. 2d 77, 86 (D.P.R. 2014) ("[T]here is a difference between being the only sales representative selling certain products in one entire market without an intention for exclusivity, and being the exclusive sales representative of those same products in that same market.").

Second, Clean Air's sales of Innovair products in Puerto Rico fall squarely within the type of conduct that violates exclusivity, because such sales encroach upon the very market territory in which FDSC operated. As noted in the *Report and Recommendation*, "FDSC argues that a distinction should be drawn, because Clean Air was a retailer of air conditioning units, not a wholesaler like FDSC." (Docket 117 at 9 n.2). Yet, this is "of no consequence," given that the central issue as to "exclusivity is that Innovair was selling directly in Puerto Rico," rather than selling through FDSC. (Id.).

To boot, the relevant legal inquiry is not based on the nature of the intermediary (retailer or wholesaler), but rather on whether the principal — in this case, Innovair — engaged in "direct sales" within the same market that was allegedly granted as exclusive to FDSC – in this case, Puerto Rico. Distribuidora VW, Inc. v. Old Fashioned Foods, Inc., 84 F. Supp. 3d 82, 88 (D.P.R. 2014) ("[T]he

Civil No. 23-1079 (GMM-GLS)
Page - 26 -

Supreme Court of Puerto Rico has held that exclusivity may be shown
if the terms of the sales representation agreement restrict either
the principal or third parties from selling 'the product in the
same territory or market in which the sales representative
operates.'") (quoting Cruz Marcano, 172 D.P.R. at 548). Even
assuming arguendo that exclusivity existed at the inception of the
parties' relationship, any such exclusivity concluded no later
than 2016, when Clean Air began distributing Innovair products in
Puerto Rico with FDSC's knowledge.

Third, albeit raising initial objections to Clean Air's
distribution of Innovair products in Puerto Rico and Innovair's
implementation of the "direct sales" model, FDSC failed to promptly
take appropriate actions to prevent these encroachments into its
allegedly protected market. See Irvine, 194 F.3d at 318 ("[O]nce
put on notice that its products are reaching an area of limited
distribution rights a principal [, in this case the distributor,]
has the obligation to take prompt positive action to curtail the
practice."). FDSC had "affirmative duty to ensure that the direct
sales would cease and avoid further interference with the Puerto
Rico market" — and yet, beyond sending a letter, FDSC took no
concrete action to halt encroachment into its purportedly
protected market. Id.

Civil No. 23-1079 (GMM-GLS)
Page - 27 -

      b.   <u>FDSC is not likely to succeed on the merits of its</u>
                <u>claim of impairment under Law 75</u>

It has been established that the dealership agreement between FDSC and Innovair was not exclusive. Nevertheless, Law 75 protects both exclusive and non-exclusive agreements. <u>Medina & Medina Inc.</u>, 840 F.3d at 41-42 ("Law 75 imposes no prohibition upon the principal of selling or establishing parallel distributorship agreements if he reserved the right to do so" under the obligation "to deal in good faith with his contracting party and not to impair the established relationship, whatever the relationship is.") (internal citations omitted).

No later than May 24, 2022, FDSC learned of Innovair's intent to deal directly with Roger Electric. See (Docket Nos. 65 at 15 ¶ 35). On June 21, 2022, FDSC sent Innovair a letter to cease and desist the alleged impairment of its distribution of Innovair products in Puerto Rico, and warning the filing of a legal action under Law 75. (Docket No. 70-25). In response, Innovair unequivocally informed FDSC that it intended to continue selling its products directly to Roger Electric, rather than through FDSC. (Docket No. 70-24). Innovair also informed to FDSC that Innovair would pay FDSC a fixed commission of three percent on all Roger Electric orders. <u>Id.</u> Innovair continued selling its products directly to Roger Electric, and FDSC did not sue. (Docket No. 98 at 291-92). It was not until March 21, 2023, that FDSC moved for

Civil No. 23-1079 (GMM-GLS)
Page - 28 -

injunctive relief - yet only in response to Innovair's filing of a legal action against FDSC. (Id. at 292-93).

Although the "direct sales model" did not displace entirely FDSC's dealership, Roger Electric – at least to some extent – assumed certain of the responsibilities previously entrusted upon FDSC, including keeping inventory, delivering Innovair products, extending credit, and assuming the financial risks of sales. (Id. at 321-22). Despite the "direct sales" model, FDSC continued to develop the market for Innovair products through advertisements, promotions, and the development of a client base; FDSC continued providing services and warranties over Innovair products sold to clients; FDSC retained control to fix its profit margins, by setting the price for each Innovair product to be purchased by Roger Electric and earning the difference between Innovair's price and the amounts paid by Roger Electric for each product; and FDSC participated in the coordination of purchase orders and payments from Roger Electric to Innovair. (Docket No. 97 at 86-88, 97-98, 103-05, 118-19, 140-41). In so doing, FDSC continued to act as a distributor of Innovair products, within the meaning of Law 75. See (id.)

The evidentiary record establishes that FDSC ultimately acquiesced to the implementation of the direct sales model. Notwithstanding its initial opposition, FDSC entered into the

Civil No. 23-1079 (GMM-GLS)
Page - 29 -

"direct sales" model out of financial necessity, allowing Innovair
and Roger Electiry to directly handle at least some of the sales
logistics and credit arrangements, while compensating FDSC. To
wit, the development of the "direct sales" model was triggered, at
least in part, by Roger Electric's large-volume orders and FDSC's
limited credit capacity, as the record shows. (Id. at 23-25).
Indeed, FDSC's President Mr. Padilla testified that this model
actually benefitted FDSC because it relieved the company from
having to extend its credit while continuing to receive
compensation for the sales:

> A: [O]ur credit line was very short and there was [sic] a lot
> of sales with big customer, big amount of money and all
> that, so we cannot cover it. So, in the conversation with
> Mr. Julio Gomez, his office in Miami, he offered me, says,
> "why we don't go and open accounts for all those customers
> and open credit lines, using them the credit lines instead
> of your credit line? So you have yours open for some other
> stuff and we can sell them, you know, direct through here.
> You put the price, you put everything and we just pay you
> back your money or difference?"

(Id. at 25). Mr. Padilla's remarks clarify the underlying motive
for FDSC to adopt the "direct sales" model: mainly, that FDSC's
credit line was exhausted or insufficient to finance large orders.
See (id. at 23-25). When Innovair proposed a workaround to FDSC's
problem — to use its own credit line to handle the sales directly
to customers – FDSC acquiesced. (Id.).

     Under the "direct sales" model, FDSC retained the ability to
set the prices, handled quotations and customer contact, and

received compensation through Innovair crediting their open account - hence confirming FDSC's participation in such a model. See (id.). The direct sales model did not directly result in FDSC's loss of agency over its business dealings - or even displaced FDSC from the distribution of Innovair product - but, to the contrary, FDSC received certain benefits. Specifically, it "direct sales" model relieved FDSC from having to extend its own credit, while still allowing it to profit. See (id. at 26) ("Both parties benefit [sic]. Myself benefits. . . . It's a combination of business between both parties by mutual agreement"). Mr. Padilla further explained that, under the "direct sales" model, FDSC continued providing service that the customers relied on. See (id. at 27, 29).

Even though FDSC was not invoicing customers directly, FDSC remained the face of the Innovair brand — managing customer relations, service, and warranty obligations. (Id.). This further supports the position that the "direct sales" model did not replace FDSC's role but rather restructured it in a format that would be more financially sustainable for FDSC. (Id. at 91) (indicating that FDSC's responsibilities as a distributor "didn't change" after the direct sales method was implemented).

Ultimately, the transcript supports the finding that the "direct sales" model was developed out of necessity due to FDSC's

Civil No. 23-1079 (GMM-GLS)
Page - 31 -

limited credit capacity, and with FDSC's knowledge and acquiescence. See (id.). As Mr. Padilla testified, FDSC's "credit line was very short . . . so we [could not] cover it," which was why Innovair proposed the "direct sales" business model while allowing FDSC to "put the price" and receive "the profit in our open account." (Id. at 25-26). Far from being imposed unilaterally, this arrangement was "a combination of business between both parties by mutual agreement." (Id. at 26).

Taken together, foregoing analysis weights against FDSC's claim of impairment, and the issuance of a preliminary injunction. As aforementioned, "the plaintiff's likelihood of success on the merits in a Law 75 action bears heavily on the weight of the parties' interests and whether an injunction would serve the purposes of Law 75." José Santiago, Inc., 66 F.4th at 347-48; see also Pan Am. Data Comput. Corp. v. Data Gen. Corp., 652 F.2d 215, 217 (1st Cir. 1981) ("While the statute [Law 75] does not require a finding of likelihood of success as a prerequisite to issuance of an injunction, the [C]ourt's view of the merits would certainly affect its judgment of the weight of the parties' interests and of the injunction's effect on the statutory policies."). In light of the foregoing analysis, this factor weights against the issuance of a preliminary injunction.

Civil No. 23-1079 (GMM-GLS)
Page - 32 -

2.    Irreparable Harm

"To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm." Sierra Club v. Larson, 769 F. Supp. 420, 422 (D. Mass. 1991). "Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness, 649 F.2d 71, 74 (1st Cir. 1981). Accordingly, "[p]laintiffs must establish injury that is not remote or speculative, but is actual and imminent." Sierra Club, 769 F. Supp. at 422; see United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953).

It remains black-letter law that, where monetary damages are available, courts should be wary of issuing a preliminary injunction. See NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc., 927 F.3d 1, 5 (1st Cir. 2019) ("The general rule . . . is that 'traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable.') (quoting Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009)); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (where "an award of pecuniary damages" would make the plaintiffs whole, this "legal remedy is adequate" and a preliminary injunction is

Civil No. 23-1079 (GMM-GLS)
Page - 33 -

inappropriate.); Sierra Club, 769 F. Supp. at 422 ("Irreparable injury is that injury for which money damages are not adequate compensation.").

Here, FDSC allegedly suffered the loss of sales and profits purportedly due to Innovair's putative breach of the parties' exclusivity agreement. Without ruling on the merits of this claim - and assuming arguendo that such may be true - the adequate remedy to make FDSC whole for the loss of sales and profits would be monetary compensation, not injunctive relief. Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 61 (1st Cir. 1998) (if money damages will adequately redress the harm, then injury is not considered irreparable and injunctive relief is not warranted). To this point, FDSC acknowledges as much, stating that "the R&R correctly concludes that some of the damages that FDSC may suffer can be economically compensated; FDSC does not dispute that." (Docket No. 118 at 20).

In addition to the loss of sales and profits, FDSC further argues that it has suffered reputational harm which "although economic in nature" is "hardly quantifiable." (Id. at 20). Even accepting that reputational harm may, in appropriate circumstances, constitute irreparable injury, the record does not support such a finding here. In the context of Law 75, "[e]xamples of irreparable injuries include . . . harm to goodwill or

reputation." Dunkin' Donuts Franchised Rests. LLC v. Wometco Donas Inc., 53 F. Supp. 3d 221, 230 (D. Mass. 2014). The First Circuit has likewise recognized that "injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 20 (1st Cir. 1996). This principle applies with particular force when the alleged reputational harm is likely to cause customers to turn to competitors. Id. However, courts are not obligated to mechanically find irreparable whenever reputational harm is alleged. Rather, such claims must be evaluated "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010) (internal citations omitted).

    FDSC claims that, absent injunctive relief, it would suffer reputational harm because it would be unable to provide warranties for Innovair products. The evidentiary record, however, does not support this contention. While FDSC testified that it provides warranties for Innovair products sold directly by Innovair to Roger Electric under the "direct sales" model (Docket Nos. 97 at 91-92;

98 at 178–82), Innovair testified that such warranties are guaranteed by Roger Electric (Docket No. 104-2 at 111). In any event, the record establishes that the direct sales model did not prevent FDSC from purchasing Innovair products directly from Innovair, including parts and accessories needed to service outstanding warranties. See id. Moreover, FDSC is not prevented from purchasing and distributing Innovair products, particularly given Innovair's expressed willingness and capacity to fulfill purchase orders from FDSC. (Docket No. 104-2 at 60). Because the record reflects a continuing potential for business between the parties, speculative assertions to the contrary do not establish irreparable harm. In re Rare Coin Galleries of Am., Inc., 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction.").

Equally significant to the irreparable-harm analysis is FDSC's delay in seeking injunctive relief. FDSC waited approximately ten months after the implementation of the challenged conduct before requesting a preliminary injunction. Such delay undermines any claim of immediacy or urgency and weighs heavily against a finding of irreparable harm, particularly where injunctive relief was sought only after Innovair initiated this litigation. See Systema de P.R., Inc. v. Interface Int'l, Inc.,

Civil No. 23-1079 (GMM-GLS)
Page - 36 -

123 P.R.D. 379 (P.R. 1989) (denying injunctive relief under Law 75
after a fifteen-month delay); Freightliner, LLC v. P.R. Truck
Sales, Inc., 399 F. Supp. 2d 57, 62 n.2 (D.P.R. 2005) (four-month
delay "militates against a finding of irreparable harm"); Oliva v.
Ramirez, No. 07-CV-1569, 2007 WL 2436305, at *3 (D.P.R. Aug. 21,
2007) (delay "undercuts the sense of urgency that ordinarily
accompanies a motion for preliminary relief and suggests that there
is, in fact, no irreparable injury") (quoting Le Sportsac, Inc. v.
Dockside Rsch., Inc., 478 F. Supp. 602, 609 (S.D.N.Y. 1979)).

      As such, FDSC has fallen short of demonstrating the existence
of an irreparable injury. See González-Droz v. González-Colón, 573
F.3d 75, 79 (1st Cir. 2009) (movant bears the burden of
demonstrating irreparable harm). Considering that a showing of
irreparable injury is "a necessary threshold requirement for the
issuance of a preliminary injunction," Charlesbank Equity Fund II,
370 F.3d at 155, this factor weighs against issuance of a
preliminary injunction. Accordingly, because FDSC has failed to
demonstrate a concrete, imminent, and non-compensable injury
attributable to Innovair's conduct, it has not satisfied the
irreparable-harm requirement for preliminary injunctive relief.

      3.   Balance of Equities

      The balance of equities concerns "the hardship to the movant
if an injunction [is] not issue[d] as contrasted with the hardship

Civil No. 23-1079 (GMM-GLS)
Page - 37 -

to the nonmovant if it does." Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003). "The crux of the balance of equities inquiry is whether 'the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" Grant v. Trial Ct., 784 F. Supp. 3d 475, 490 (D. Mass. 2025) (quoting Dataphase Sys., Inc. v. C L Sys., Inc. 640 F.2d 109, 113 (8th Cir. 1981)).

Through the issuance of a preliminary injunction, FDSC seeks to be able to set the prices of Innovair products sold directly by Innovair to Roger Electric – thus allowing Innovair to earn a profit margin larger than the three percent status quo. If a preliminary injunction is granted and FDSC increases the price of Innovair products sold to Roger Electric, FDSC would effectively gain control over Innovair's ability to compete with other air-conditioning brands available to Roger Electric: By raising prices to a level that makes it impractical for Roger Electric to purchase and distribute Innovair products, FDSC could indirectly force exclusivity between FDSC and Innovair. In other words, FDSC could inflate Roger Electric's purchase price of Innovair products to the point where Innovair's only viable option would be to sell its products exclusively to FDSC. See Systema de P.R., 123 D.P.R. at 388 (reversing a lower Court's issuance of a preliminary injunction because Law 75's provision of injunctive relief should not be used

to mechanically or automatically reinstate dealership agreements, nor should it be exercised to award "an exclusivity" that the parties "never had").

This Court has already rejected FDSC's claim of exclusivity, and "Law 75 does not operate to convert non-exclusive distribution contracts into exclusive distribution contracts." Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, 96 F.3d 10, 14 (1st Cir. 1996); Vulcan Tools, 23 F.3d at 569. Allowing FDSC to control prices for Innovair products would restrict Innovair's competitive abilities and may even impose an exclusivity that FDSC never enjoyed in the first place. As such, the balance of equities weight towards the denial of the sought preliminary injunction.

4.   Public Interest

The enactment of Law 75 by Puerto Rico's Legislature reveals that the public has an interest in "protect[ing] Puerto Rico dealers from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products, 'thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities.'" R.W. Int'l Corp. v. Welch Food, 13 F.3d 478, 482 (1st Cir. 1994) (quoting Medina & Medina, 858 F.2d at 820).

Civil No. 23-1079 (GMM-GLS)
Page - 39 -

Taking this into account, the following remains undisputed. FDSC promoted Innovair's brand and obtained clientele for Innovair products in Puerto Rico. (Docket No. 65 at 12 ¶ 17). Roger Electric was a client of FDSC and FDSC's sales of Innovair products to Roger Electric added up to fifty percent of FDSC's total annual sales. (Id. at 13 ¶ 21). Through the "direct sales" model, Innovair changed FDSC's compensation structure by selling directly to Roger Electric and, thus, bypassing FDSC as an intermediary. See (id. at 16 ¶ 46).

Whereas Law 75 intends to protect FDSC's legitimate business interest upon creating a favorable market for Innovair products, it is not less true that FDSC is not likely to establish an exclusive right to distribute Innovair products in Puerto Rico. See Medina & Medina, 840 F.3d at 41-42. Because issuing the requested injunctive relief would allow FDSC to control the prices offered to Roger Electric and, thus, limit Innovair's ability to compete for Roger Electric's business and may even force an exclusivity that did not exist in the first place – hence, contradicting Law 75's legislative intent and contravening the public interest. Consequently, this factor weighs against granting injunctive relief.

Civil No. 23-1079 (GMM-GLS)
Page - 40 -

### IV.   CONCLUSION

For the reasons set forth above, the Court **ADOPTS WITH MODIFICATIONS** Magistrate López-Soler's *Report and Recommendation*. FDSC's request for injunctive relief is **DENIED**.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on January 16, 2026.


/s/ Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE